**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**CLAUDIA S. GORAYEB,**

**Plaintiff,**

**v.**                                         **Civil Action No. 2:11-CV-36**

**MICHAEL ASTRUE,**
**Commissioner of Social Security,**

**Defendant.**

**REPORT AND RECOMMENDATION**
**THAT CLAIMANT'S MOTION FOR SUMMARY JUDGMENT BE DENIED AND**
**COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT BE GRANTED**

**I.  Introduction**

A.    Background

     Plaintiff, Claudia S. Gorayeb, ("Claimant"), filed her Complaint on April 27, 2011,

seeking judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security ("Commissioner").[1]  Commissioner filed his Answer on June

28, 2011.[2]  Claimant filed her Motion for Summary Judgment on August 12, 2011.[3]

Commissioner filed his Motion for Summary Judgment on October 12, 2011.[4]

B.    The Pleadings

     1.    Claimant's Motion for Summary Judgment & Memorandum in Support

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket No. 13.

[4] Docket No. 16.

2.      Commissioner's Motion for Summary Judgment & Memorandum in Support

C.      Recommendation

I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because the Administrative Law Judge ("ALJ") did not err in the weight he gave to the treating physician's opinion, did not err in not providing medical testimony at the hearing, and did not err by posing an incomplete hypothetical.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

A.      Procedural History

Claimant filed an application for Disability Insurance Benefits on November 28, 2007, alleging disability since March 20, 2002 due to depression, obsessive compulsive disorder, generalized anxiety disorder, and borderline intellectual functioning. (Tr. 16, 138-50, 230). The application was initially denied on February 19, 2008 and on reconsideration on May 14, 2008. (Tr. 16, 97-102). Claimant requested a hearing before an ALJ and received a hearing on July 17, 2009 in Morgantown, West Virginia. (Tr. 24-76).

On October 15, 2009, the ALJ issued a decision adverse to Claimant finding that she was not under a disability within the meaning of sections 216(I) and 223 of the Social Security Act from March 20, 2002 through the date of the decision, and that she retained the residual functional capacity to perform work at that did not require high production rates or high sales quotas, and was limited to simple, routine, one-to-two step tasks with no more than minimal

contact with the general public and no more than occasional contact with supervisors and co-workers.  (Tr. 20, 23). Claimant requested review by the Appeals Council but was denied. (Tr. 1-5). Claimant filed this action, which proceeded as set forth above, having exhausted her administrative remedies.

B.    Personal History

Claimant was born on February 26, 1969, and was forty years old on the date of the July 17, 2009 hearing before the ALJ. (Tr. 32). Claimant completed school through the eleventh grade and attended school for part of twelfth grade (Tr. 38), however, she did not graduate and did not pass the GED test. (Tr. 38-39).  Claimant has prior work experience serving food at Bud's Club, preparing food at Wendy's fast food restaurant, unloading a catering truck for her neighbor, carrying coins at Wheeling Island, operating the cash register at Shaw's Drive Through, cleaning for a cleaning company, opening boxes and distributing goods at a prison commissary, and validating sales for a telemarketing company. (Tr. 30, 37, 39-40, 42, 44-47, 58).

C.    Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that the Claimant is not under a disability and can still perform work in the national economy:

On July 17, 2007, Dr. Michael J. Marshall performed a mental health court evaluation of Claimant at the Lakin Correctional Center, where claimant was incarcerated for transporting stolen property across state lines.  (Tr. 234). He gave her Axis I diagnoses of depression, anxiety, OCD, ADHD, and a learning disability, and he also rated her global assessment of functioning at

50. (Tr. 235).

Claimant then began seeking regular treatment at Northwood Heath Center on November 1, 2007 for depression, isolation and anxiety. (Tr. 237). Monica Smith, a nurse practitioner at the Center, started her on Wellbutrin after diagnosing her with depression and substance abuse. (Tr. 239). Claimant returned to the Northwood Health Center on November 12, 2007 for her first individual therapy session with Dr. Meredith Perry where she reported high levels of anxiety and paranoia. (Tr. 241). On November 15, 2007, Claimant came back to the Center for a follow up visit and medicine check where Monica Smith switched her to Lexapro. (Tr. 243). On November 21, 2007 she created an individual treatment plan with her case manager Steven Gonchoff and psychologist Roberta Welling. (Tr. 245-53). On November 26, 2007, Claimant came in for another appointment at Northwood where she reported high levels of anxiety and energy and was given a mental status anxiety acuity rating of severe. (Tr. 254).

On December 10, 2007, Claimant went for another appointment at Northwood where she reported a moderate to severe level of symptoms and the doctor noted her progress toward her goal of improving was minimal. (Tr. 255). On December 11, 2007, she was put back on Wellbutrin and also started Depakote. (Tr. 275). On December 20, 2007, she was told to continue with the Depakote and Wellbutrin. (Tr. 277).

On January 7, 2008, she was seen again by Dr. Perry where she reported ongoing issues with mania and severe agitation. (Tr. 278). On January 8, 2008, Claimant underwent a psychological evaluation with Marilyn N. Brady, Ph.D. She was rated a forty on the Global Assessment of Functioning (GAF) scale. (Tr. 284). Her overall intellectual functioning appeared below average (Tr. 281) and she was diagnosed with moderate major depressive disorder,

anxiety disorder, cocaine dependence, adult attention deficit disorder, and personality disorder. On January 9, 2008, Claimant reported no problems with sleep or mania and he Depakote dosage was increased. On January 23, 2008, she was told to continue with her current medications. (Tr. 285-86). On January 24, 2008, she saw her therapist again and reported continued problems with anger and hyperactivity. (Tr. 287). On January 25, 2008, Dr. Jim Capage conducted a psychiatric review technique and found that her impairments were "severe but not expected to last 12 months." (Tr. 257). When assessing her functional limitations, he noted she had a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 267). Finally, he noted that "it is expected that the mental impairments will not continue to meet the Listings for a year, and as of 11/08, she will have gained the necessary residual functional capacity to engage in SGA." (Tr. 269). He also conducted a Mental Residual Functional Capacity Assessment (MRFCA), and concluded that "she would retain the mental-emotional capacity to perform simple unskilled work-related activities in a low demand/slow paced setting." (Tr. 273).

 On February 6, 2008, her medications were adjusted again to include Lamictal. (Tr. 289). On her February 11, 2008 meeting with her therapist, she reported issues with agitation and fear of being around people. (Tr. 290). On February 18, 2008, she again reported low tolerance for other people, getting angry easily, and low self-esteem. (Tr. 293). On February 27, 2008, her medication was changed to include Abilify. (Tr. 294).

On March 6, 2008, she reported that her depression was getting better, but that she still had anger problems. (Tr. 295). On March 20, 2008, her medication was modified to decrease the amount of Abilify. (Tr. 296). On March 25, 2008 in an anger management session she reported

she "often is extremely irritable and has exaggerated anger responses to events." (Tr. 361). On March 27, 2008, she reported to her psychologist that her medication is helping some, although she still has anger issues and has a lot of energy. (Tr. 363).

On April 4, 2008, Claimant was told to continue following her current medications. (Tr. 360). On April 7, 2008, in a session with her psychologist, Claimant reported she is calmer than in the past, and that she has not been as angry as she has been previously. (Tr. 358). On April 8, 2008, Claimant "participated actively and positively" in an anger management group therapy session. (Tr. 357). On April 10, 2008, Claimant received another individual treatment plan, which was signed by her therapist, case manager, psychologist, and nurse clinician. (Tr. 345-56). On April 17, 2008, her psychologist noted that Claimant was able to discuss the stressors that have been leading to her anxiety, including depression and relationship issues. (Tr. 343). Also on that date, Ms. Smith told her to stay on her current medications. (Tr. 344). On April 21, 2008, Claimant noted an increase in symptoms due to learning that she is going to be losing her medical card and that she was frustrated with living paycheck to paycheck. (Tr. 341). On April 24, 2008, Claimant met with her psychologist and reported anxiety and depression relating to her daughter. (Tr. 340).

On May 1, 2008, Ms. Smith instructed Claimant to continue with her current medications. (Tr. 339). On May 8, 2008, Claimant told her psychologist she had started a new job but that she thought her employer was taking advantage of her. (Tr. 337). On May 9, 2008, Claimant had another MRFCA, and Dr. Bartee noted that Claimant retains "sufficient mental capacity to perform simple 1-2 step routine and repetitive work-like activities in a low demand/pressure setting with limited expectations for social interations [sic] with coworkers,

supervisors or the general public." (Tr. 299). Her psyciatric review technique noted that her impairments were severe but not expected to last 12 months. (Tr. 301). On May 12, 2008, Claimant reported to her psychologist that she "has not been as anxious or had as many racing thoughts, as she has a part-time job that has been keeping her busy." (Tr. 338). On May 15, 2008, Ms. Smith started decreasing her Trazadone, started her on Restoril, and Strattera, and decreased her Wellbutrin. (Tr. 336). On May 28, 2008, her pharmacologist began tapering and decreasing her Wellbutrin, increased her Strattera, and started Elavil. (Tr. 335). In a session with her psychologist on May 29, 2008, she noted Claimant "still reports high levels of agitation and hostility with everyone. She reports that she is still working a couple days a week, but doesn't think she will keep the job much longer." (Tr. 333).

In a session with Ms. Smith on June 11, 2008, she noted "the patient is functional" and instructed Claimant to stay on her current medications." (Tr. 332). On June 12, 2008, in a session with her psychologist, Claimant "appeared manic and not very open during the session," however it did appear Claimant was employed as she reported conflict with her boss's husband. (Tr. 329). On June 30, 2008, Claimant reported that she was still working and that she was not going to continue taking her medication since she was feeling better without it. (Tr. 330). On June 30, 2008 Claimant developed another individualized treatment plan with her case manager and psychologist, including goals of effectively managing her symptoms by developing and utilizing coping skills. (Tr. 318-28).

On July 3, 2008, her pharmacologist reported "[t]he patient described having no difficulties. The patient denies depression or anxiety. Client reports out of meds- states she's fine. However, she does report irritability, high energy and restlessness." (Tr. 317). On July 17,

2008, Ms. Smith noted that "[t]he patient is making progress. She also noted that "[p]atient is sleeping well. Appetite is good...Mood stabilizing." (Tr. 316).

On September 23, 2008, Claimant's psychological treatment was terminated because she had not returned for treatment since July 17, 2008. (Tr. 315).

On May 14, 2009, in order to be accepted to Northwood for outpatient services, Claimant had a medical necessity assessment. During the assessment, Claimant reported an increase in agitation and anxiety, that she has been withdrawn from others, that she has been off her medication for the past few years, that she cries all the time, and that her depression is up and down. (Tr. 370). When asked how troubled she is by psychological or emotional problems, she reported she was moderately troubled. (Tr. 372). When asked how troubled she was by employment problems, she reported not at all. (Tr. 375). When the clinician, Sean T. Stoll, was asked to assess her level of functioning with school/work, he reported she needed minimal assistance, (Tr. 377), although he noted Claimant would need substantial assistance with activities of daily living like managing finances and managing free time. (Tr. 377). At the end of the evaluation, the psychologist's recommendation was individual therapy to address anxiety, depression and relationship issues. (Tr. 378).

When asked on May 21, 2009, in her first session with Dr. Meredith Finsley in over a year, Claimant reported that she had a significant increase in symptoms, due to being off her medication and due to the legal issues she and her daughter are facing." (Tr. 368). On June 4, 2009, Claimant reported "high levels of depression, anger, impulsivity and mood swings" to her psychologist, Meredith Finsley. (Tr. 366).

D.      Testimonial Evidence

Testimony was taken at the hearing held on July 17, 2009. The following portions of the testimony are relevant to the disposition of the case:

Claimant testified that she is not employed and that the last time she had a job was in June 2008 helping a neighbor unload her catering van and carrying things into the house. (Tr. 37-38). The job ended when "she said something smart to [her] and [she] just walked out." (Tr. 37-38). Claimant also testified that she worked for JAK Productions validating sales. (Tr. 39-41). She testified to working at Wendy's "making chicken nuggets and french fries," (Tr. 42-43), and that she stopped working there because "they said [she] wasn't going fast enough. [She] wasn't paying attention when the fries were done...[Her] mind was wandering or something." (Tr. 43).

Claimant also testified to working at Bud's Club, a restaurant owned by her husband, where she served food at lunchtime. (Tr. 43-44). Claimant testified that she carried coins at Wheeling Island, but that she stopped working there after two weeks because "it takes forever for you to get your license." (Tr. 45). She testified to working at Shaw's Drive Through in Bridgeport where she operated the cash register, but she quit because her register was always coming up short. (Tr. 46-47). Claimant also testified to working for a cleaning company where she "[c]leaned big banks and stuff and then [ ] got graded." (Tr. 47). She testified that she stopped working there because she was upset over getting bad grades. (Tr. 47-48). She also testified to working for the commissary distributing goods to inmates. (Tr. 57-59).

When Claimant was asked whether she usually quits things when she gets mad she replied yes, and when asked if she gets mad often, she said "Oh, yes. I get mad easy." (Tr. 60). When asked what she would do when employers critiqued her, she testified: "I'd leave. I'd just leave. I really don't fly off the handle. I just leave." (Tr. 62). She testified that she feels she

cannot work because she "can't seem to comprehend anything. [She] can't follow instructions." (Tr. 49). Claimant also testified that she feels other people are judging her al the time and this makes her insecure. (Tr. 62-63).

Claimant testified that she was going to Northwood for treatment for attention deficit disorder and other mental problems, but "Northwood to [her] is a joke. It's like [she's] a guinea pig." (Tr. 52). She testified that all she does during her sessions with the psychologist is "talk[ ] about what happened like that week." (Tr. 54).

When Claimant was asked what kind of things she does around the house like cook or clean, she replied: "I just lay around." (Tr. 57). She continued by saying "mostly I just lay around because I'm always like– I don't know– disappointed. I don't know." (Tr. 63). However, she did testify that she tries to keep a neat home and that she doesn't like anything out of place. (Tr. 63).

At the hearing, the ALJ also posed the following hypothetical to the VE:

> I want you to assume that the Claimant is not limited from an exertional standpoint, but would be limited to doing– wouldn't be able to do jobs that would require high production rates such as assembly work or high sales quotas such as telemarketing sales, jobs that would be simple, routine, one to three step tasks and jobs that would require no more than minimal contact with the general public and occasional contact with co-workers and supervisors. Would there be any full-time, unskilled jobs such a hypothetical person could do in the local or national economy?

(Tr. 69-70)

The VE then responded that:

> Some jobs at the medium level that would comply with your hypothetical would be a janitor or cleaner. The *DOT* is 389.683-010. There are 11,500 in the local labor market, 1,500,000 nation. There are also vehicle washers. The *DOT* is 919.687-014, 630 local, 140,000 nation. There are also hand packers. The *DOT* is 920.587-

018, 400 local, 118,000 nation.

(Tr. 70).

The ALJ then added additional limitations to the first hypothetical that he posed to the VE:

> I want you to assume a hypothetical individual the same age, education and work experience as the Claimant with no physical limitations, but be limited as I previously gave you, but with further limitations that the individual would only be able to have minimal contact with co-workers and supervisors, and again defining that as 10 percent or less of the workday. Would there be any full-time, unskilled jobs such a hypothetical person could do in the local or national economy with those limitations?

(Tr. 71-72).

The VE responded that: "I would feel that the vehicle washer and the janitor would comply with that. The hand packer does not require interaction with others, but they would be in the proximity. The other two jobs a person works by themselves usually." (Tr. 72). The ALJ then added additional limitations to the original hypothetical:

> All right. I want you to assume a hypothetical individual the same age, education and work experience as the Claimant, wouldn't be limited form a physical standpoint, but due to the individual's impairments would be off task two hours out of an eight hour workday. Would there by any full-time, unskilled jobs such a hypothetical person could do in the local or national economy with those limitations?

(Tr. 72).

The VE responded: "No, your honor." (Tr. 72). The AJL then added another limitation to the hypothetical:

> The same question, different limitation. Due to the individual's impairments the individual wouldn't be limited exertionally, but would be absent from work three days a month due to the individual's impairments. Would there by any full-time, unskilled jobs such a hypothetical person could do in the local or national economy with those limitations?

(Tr. 72-73).

The VE again responded: "No, your Honor." (Tr. 73).

E.      Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

Claimant has been married for fifteen years, although she reports often having problems with her husband. (Tr. 32, 237). Her husband is employed as a security guard at Wheeling Jesuit University. (Tr. 37). She has two stepsons who were twenty-seven as of the date of the hearing, and she has two biological children who were twenty-three and seventeen as of the date of the hearing. (Tr. 33, 35, 238). Her younger daughter was removed from her home by Child Protective Services in May 2006, and was living with her sister-in-law, but she had been returned to her custody as of the date of the hearing. (Tr. 32, 237). Her daughter was unable to be placed in her husband's custody because he was also in prison at the time, although he is out now and has been clean for four years. (Tr. 34-35).

She does not have a drivers license due to unpaid fines and a reckless driving charge, so Claimant relies on her husband for rides or she walks. (Tr. 36).

On November 1, 2007, she admitted she used crack daily and began using at age twenty-six. (Tr. 237). She testified that she had done drugs for "probably two to three years of [her] life." (Tr. 49). She was sent to prison in 2007 for six months transporting stolen goods across state lines to her crack dealer and while she was on probation for that offense, she was arrested for shoplifting food from Kroger. (Tr. 49, 238). She was sent to jail for another eight months for this offense. (Tr. 238).

### III.  The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant's brief alleges three instances of error on the ALJ's part: 1) the ALJ failed to properly assign weight to the opinion of the treating physician and substituted his own lay opinion;  2) the ALJ erred in failing to have a medical expert at the hearing to provide testimony; and 3) the ALJ erred in eliciting testimony from the vocational expert with an incomplete hypothetical.

Commissioner contends the ALJ's decision is supported by substantial evidence and should therefore be affirmed.  Specifically, Commissioner responds that: 1) the ALJ properly weighed the opinions of Claimant's medical source providers,  2) the ALJ was not required to have a medical expert at the hearing, and 3) the ALJ's hypothetical questions to the vocational expert were supported by the record.

B.      The Standards.

1.      Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c)); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995).

6.    Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the

Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

       7.     <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

       8.     <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

       9.     <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

15

C.    <u>Discussion</u>

    1.    <u>Whether the ALJ Erred by Not Properly Assigning Weight to the Opinion of the Treating Physician and by Substituting His Own Lay Opinion</u>

The ALJ concluded Claimant has the "residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: no high production rates or high sales quotas and limited to simple, routine, 1-3 step tasks with no more than minimal contact with the general public and no more than occasional contact with supervisors and co-workers." (Tr. 20). Claimant argues this was in error because the ALJ did not give proper weight to the opinions of the treating physician, because he did not address a functional assessment from the Claimant's treating source, and because he substituted his own lay opinion for those of the treating source. (Pl's Mot. Summ. J. 3-4).

As a general rule, the opinion of a treating physician will be given controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). <u>See</u> <u>also</u> <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984); <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990). When not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following five factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization. 20 C.F.R. § 404.1527(d), 416.927(d). <u>See</u> <u>also</u> <u>Heckler</u>, 734 F.2d at 1015. When an ALJ does not give a treating source opinion controlling weight and determines that benefits should be denied, the decision must contain "specific reasons for the weight given to the treating source's medical

opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the wight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2. <u>See</u> <u>also</u> 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In this case, the record is fully and fairly developed on the issue of why the ALJ gave weight to the opinions of the State Agency psychologists. During the hearing, the ALJ asked Claimant's attorney, Elizabeth Leffel, "Do we have functional statements from the Northwoods or any other treating sources?" to which Claimant's attorney responded: "No, but we have the MRFCs from the State Agency." (Tr. 69). This testimony is what led the ALJ to state in his opinion that "neither the claimant's psychiatrist or therapist have offered opinions with regard to the claimant's limitations or disability." (Tr. 22). Now, Claimant's attorney asserts that the ALJ should have given weight to the opinions of her treating sources when by her own admission there are no such opinions. Additionally, although Claimant provides forty-two pin cites to the record where she made visits to Northwood, (Pl's Mot. Summ. J 3), Claimant has no where identified which source is a "treating source" which should have been given more weight. This Court thus finds this argument unpersuasive.

Additionally Claimant argues that the ALJ should have given weight to the functional assessment performed by an alleged treating source, found on pages 370-79 of the record. As noted above, as a general rule, "[circuit] precedent does not require that a treating physician's testimony 'be given controlling weight.'" <u>Craig</u>, 76 F. 3d 585, 595 (4th Cir. 1996)(quoting <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992)). It will be given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and if

it is "not inconsistent with other substantial evidence." 20 C.F.R. § 416.917 (d)(2)(e). An ALJ is also not bound to accept the opinion of a treating physician which is speculative and inconclusive. <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

In this case, the assessment on pages 370-79, which the Claimant calls a "functional assessment"was actually a "medical necessity assessment," and was performed by Sean T. Stoll. Mr. Stoll is a clinician, and his credentials indicate he has only a bachelor's degree in traditional Chinese medicine and had  met with Claimant on just this one occasion, (Tr. 378), meaning that Mr. Stoll is not a specialist and that there was not a long treatment relationship between them. During the assessment, when asked how troubled Claimant was by the psychological and emotional problems she was experiencing, Claimant responded only "moderately," (Tr. 372) and when asked how important treatment was to her for these problems, she again responded only "moderately." (Tr. 372). At the end of the assessment, although Mr. Stoll noted marked impairment in social, interpersonal, and family functioning, the ALJ was not bound to give this opinion weight because he determined that this assessment had been undermined by other medical evidence. <u>See</u> <u>Coffman</u>, 829 F.2d at 517 (4th Cir. 1987). The ALJ stated that he instead "affords significant weight to the State Agency psychologists as they are consistent with the record as a whole." (Tr. 22). The first State Agency record indicates that Claimant "seems that she would retain the mental-emotional capacity to perform simple unskilled work-related activities in a low demand/slow paced setting." (Tr. 273). Similarly, another State Agency assessment indicated that she "appears to retain sufficient mental capacity to perform simple 1-2 step routine and repetitive work-like activities in a low demand/pressure setting..." (Tr. 299), and that "claimants [sic] expected to be capable." (Tr. 313).  These State Agency reports are also

consistent with the statements of Dr. Brady. Dr. Brady found that Plaintiff showed attention and concentration, had coherent though processes, and could function with extra effort. (Tr. 281-82). With this evidence in the record, the ALJ had good reason for not giving weight to the assessment completed by Mr. Stoll, and thus the Court finds Claimant's argument unpersuasive.

Finally, Claimant argues that the ALJ improperly substituted his lay opinion for those of the State Agency and the treating sources. As a rule, it is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. In this case, the ALJ was not substituting his opinion for those of others, he was merely resolving a conflict in the evidence, as the law requires him to do. In April 2008, as the ALJ cites, when Claimant appeared for therapy, she "presented much clamer [sic] [ ] than she has in the past," she reported that "her medication is starting to help," and that "she hasn't been as angry as she has been previously." (Tr. 359). Claimant claims this is contrary to clinician Stoll's assessment where he found her to have "severe anxiety and agitation," which Claimant takes as evidence that the ALJ substituted his own opinion when making his determination. However, as already noted above, the ALJ properly discredited Mr. Stoll's opinion as it was inconsistent with other substantial evidence in the case record, so the ALJ properly resolved this conflict by crediting other sources. Accordingly, the Court finds this argument to be without merit.

    2.    <u>Whether the ALJ Erred in Failing to Have a Medical Expert Provide Testimony at the Hearing</u>

Claimant next cites the Hearings, Appeals and Litigation Law Manual ("HALLEX") for the proposition that the ALJ must admit medical expert opinion testimony rather than interpreting background medical data on his own. (Pl's Mot. Summ. J. 6) (citing HALLEX I-2-5-34). "HALLEX is a manual in which the Associate Commissioner of Hearings and Appeals

coveys guiding principles, procedural guidance and information to the Office of Hearings and Appeals (OHA) staff. HALEX includes policy statements resulting from an Appeals Council *en banc* meeting under the authority of the Appeals Council Chair." Melvin v. Astrue, 602 F.Supp.2d 694, 699-700 (E.D.N.C. 2009)(internal citations omitted). Although HALLEX is not authoritative, it provides instructions for ALJs to follow. HALLEX I-2-5-34 states that the ALJ must obtain an ME's opinion "to evaluate and interpret background medical test data," and it includes a cross-reference to HALLEX I-2-5-14D, the section on medical test data. That section explains that "if a report raises a question about the accuracy of the medical test results reported, the ALJ may ask the source to submit the background medical test data...[and] interpretation and evaluation of the background medical test data would require a medical expert."

In this case, the ALJ is not making an attempt to evaluate and interpret background medical test data; the data, i.e. Claimant's responses to the State Agency's assessment form, were interpreted by State Agency officials, who came to the conclusion that she was still able to maintain employment. The ALJ did not interpret the medical test data himself, without an expert, but was relying upon the results and conclusions made by the State officials. Accordingly, HALLEX I-2-5-34 has no bearing on this issue and the ALJ was not required to admit medical expert testimony. Furthermore, there is no provision in the Commissioner's regulations that requires medical expert testimony to be admitted at hearings. The regulations specifically state that the use of a medical expert is discretionary. 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii). Here, the ALJ had evidence from Claimant's treating medical sources in the record as well as evidence from State Agency psychologists, so he was able to determine the nature and severity of Claimant's impairments without medical expert testimony, pursuant to

regulations. Accordingly, Claimant's argument is without merit.

      3.      Whether the ALJ Erred in Eliciting Testimony from the Vocational Expert with an Incomplete Hypothetical

Claimant contends the ALJ used an incomplete hypothetical due to lack of medical expert testimony at the hearing. (Pl's Mot. Summ. J. 7). More specifically, Claimant argues that by giving the vocational expert an incomplete hypothetical based only on the ALJ's opinion, he elicited vocational expert testimony that does not reflect Claimant's limitations. Id.

The Fourth Circuit Court of Appeals has held, in an unpublished opinion, that while questions posed to a vocational expert must fairly set out all of the Claimant's impairments, the questions need only reflect those impairments supported by the record. Russell v. Barnhart, 58 Fed. Appx. 25, 30; 2003 WL 257494, at 4 (4th Cir. Feb. 7, 2003). The Court further stated that the hypothetical question may omit non-severe impairments but must include those that the ALJ finds to be severe. Id. Moreover, based on the evaluation of the evidence, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)). Moreover, the ALJ is afforded "great latitude in posing hypothetical questions." Koonce v. Apfel, 166 F.3d 1209; 1999 WL 7864, at *5 (4th Cir. 1999) (citing Martinez, 807 F.2d, at 774). See also Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988); Hammond v. Apfel, 5 Fed. Appx. 101,105; 2001 WL 87460, at *4 (4th Cir. 2001).

In this case, the ALJ posed four hypotheticals to the vocational expert: the first assumed a hypothetical person with the same age, education, and intelligence as Claimant, and included a limitation of no high production rates and only simple, routine, one to three step tasks with

minimal contact with the general public and occasional contact with co-workers and supervisors (Tr. 69-70); the second included the further limitation of minimal contact with co-workers and supervisors, with minimal being defined as ten percent or less of the workday (Tr. 71-72); the third included the limitation of being off task two hours out of an eight hour workday (Tr. 72); and finally, the fourth included a further limitation of being absent from work three days a month due to impairments. (Tr. 73).

The ALJ did not pose any improper hypothetical to the VE. As already noted in the above analysis of HALLEX and the Code of Federal Regulations, which this Court declines to go through again, the ALJ did not err by not admitting expert medical testimony, so the ALJ committed no error by not using this testimony when formulating his hypothetical. Furthermore, Claimant has failed to point to any specific limitation that was not included in the hypothetical to the vocational expert; she states only that the expert testimony "does not accurately reflect the situation or abilities of the Plaintiff." However, even so, this Court finds that the ALJ properly supported his reasons for discrediting certain limitations and not presenting them to the vocational expert. The ALJ stated that

> [t]he claimant's nearly immediate improvement after getting custody of her daughter in April 200 with a return to part-time work, the stopping of her medication and treatment within two to three months of getting custody, the report of no symptoms at her last appointment, combined with her lack of treatment for nearly a year, her work activity, her use of alcohol, her conflicting statements as to when she last used cocaine, and her conflict with the law once again all serve to detract from the credibility of claimant's statements.

(Tr. 22).

Furthermore, the ALJ also explained why he was crediting the State Agency in deciding what limitations to include in the hypothetical. He stated that "[n]either the claimant's psychiatrist or therapist have offered opinions with regard to the claimant's limitations or disability. The

undersigned affords significant weight to the opinions of the State Agency psychologists as they are consistent with the record as a whole." (Tr. 22). If substantial evidence does not support a limitation, the ALJ need not pose that limitation in the hypothetical, and here, for the reasons the ALJ cited, there was no evidence indicating that an additional limitation should have been included.

For the above reasons, Claimant's assertions do not warrant relief.

### IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED.

2.      Commissioner's Motion for Summary Judgment be GRANTED.  The ALJ properly assigned weight to the opinions in the record; the did not err in not taking medical expert testimony at the hearing; and the ALJ did not pose an incomplete hypothetical.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: October 24, 2011

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE